May it please the court, my name is Rachel Fazio and I am here today representing plaintiffs in defense of animals. Dreamcatchers, Wild Horse and Rural Sanctuary, Barbara Clark, Chad Hanson. Could you please slow down in your delivery Miss Fazio, I find it hard to understand you if you go too quickly. Okay, thank you Judge Bea. At this time I'd like to reserve three minutes for rebuttal. But you'll have to keep track of your own time, that's the whole amount. This case challenging the 2010 Twin Peaks Roundup is centered on the protections which Congress has afforded the wild horses and burros of the West. NEPA provides protections, procedural protections, by ensuring that the impacts to the wild horses and burros from proposed management activities are fully analyzed and disclosed to the public. The Wild Horse Act provides substantive protections, among them prohibiting interference with wild burros unless it has been determined that they are causing a failure to maintain a thriving natural ecological balance. As well as ensuring that infirm horses do not necessarily suffer. May I ask you a question first Miss Fazio, which will perhaps eliminate some issues. This appeal comes to us from a motion for summary judgment which was granted to the government and your Is it your position that there are any tribal issues of fact which require remand on the basis that factual issues should not be determined in summary judgment? Or are you on all, even on all fours with the government as far as there being no tribal issues of fact? Well I think the only place where tribal issues of fact might come into play would be with regard to the thriving natural ecological balance claim. The fact that plaintiffs are asserting that they haven't made that determination. But I believe that everything rests on the record. The administrative record is the complete evidence that has been provided by the defendants to justify their position. Your position is that there is no proof as to that issue. Not that the proof adduced is capable of two interpretations. The proof is in the record and I believe that it overwhelmingly indicates that they have not made a determination that the thriving natural ecological balance is not being maintained. Thank you, you've answered my question. So I was discussing the protections that NEPA and the Wild Horse Act provide and the one thing that they all have in common here and that the facts plainly established in this case is that defendants steadfastly refuse to actually honor them. And this is seen throughout the NEPA claims as well as the Wild Horse and Borough Act claims. So I have a couple points that I think may be helpful to the court on our issues. Maybe you could help me with what it is that you actually want. There are several things we want. The first of which is to reverse the lower court's decision. No, I understand that. But I mean in the long run, what is your goal? Is it to never have any further gathers? Is it that no horses ever be destroyed? What is it we want to do here? The goal is to have management by the BLM actually implement the will of Congress. We recognize that there may be situations, just like Congress did, where the thriving natural ecological balance of the range is not being maintained and this is because of wild horses and in those circumstances, Congress permits interference with these animals. But in this situation, that benchmark was not to round up 80% of the animals on this range. So we are not here asking for more torrents. So what are we supposed to do about that? You're supposed to tell the BLM this is what Congress intended, your interpretation is not correct, the plain language of the Act governs, and you need to ensure that this HMA is managed principally for wild horses and burros. You need to ensure that management activities are not undertaken unless and until it is demonstrated that a thriving natural ecological balance is not being maintained. You need to not capture, harass, brand animals that in no way, shape, or form are actually threatening the thriving natural ecological balance on the range. Well, I don't, if you look at the District Court's opinion, it says at the time of the EA that was prepared, the population was estimated to be 2,303 horses, 282 burros, close to 4.5 times more wild horses and four times more burros than the low range of the appropriate management level. Are you saying that the appropriate management level is wrong? I'm saying that the appropriate management level is not the benchmark of the Act. The appropriate management level, as demonstrated by the defendant's own actions, is not tied to whether or not the range is being maintained in a thriving natural ecological balance. Is it the excess, is that what you're saying, that there's supposed to be a determination of the excess number of... Well, you know, as I was preparing for this argument, I think I finally understood Dalby Clark and what the thriving natural ecological balance benchmark means. And what it means is that wild horses and burros are supposed to be protected, even protected from interference from federal agencies, unless the thriving natural ecological balance of the range has been So how's that determination supposed to be made by the agency? Well, if you look at the facts of this case, they have several documents that talk about rangeland standards and whether or not those rangeland standards are being met. If there are standards that are being met, then the range is in a thriving natural ecological balance. Their own definition of TNEB is not perfection. There are permitted to be localized impacts and different resources in a state of either proper functioning condition or functioning at risk. But it's the overall assessment of range conditions that indicates whether or not TNEB is being maintained. So the agency's been doing this wrong ever since the act was passed? Well, the agency hasn't actually had their interpretation reviewed in the context of an actual roundup. According to me, plaintiffs, the agency has not been properly implementing this act. Appropriate management level is not something other than thriving natural ecological balance. Thriving natural ecological balance is the benchmark. It is the benchmark that must be passed before you can harass, capture, brand, destroy, or remove. Is it your position that there's not sufficient evidence in the BLM record of overgrazing, destruction of cultural icons, and other effects of overpopulation of the wild horse and burros to, in your phrase, threaten the quote, thriving ecological balance, unquote? Yeah, it is our position that the record demonstrates that these resources are, at the time this roundup was planned, were being maintained in a thriving natural ecological balance. They even say that in their EA, upland vegetation and land health assessments, meeting standards except for one allotment. The judge in England found that while range conditions, both water sources and vegetation, still remain fairly good. That's the thriving ecological balance. The BLM believes that decreasing the numbers of horses and burros is essential to avoid unduly depleting available resources in the long run. Is it your position that that determination by the BLM was arbitrary and capricious? Yes. And what is that based on, that they didn't have enough information in the 156-page EA to arrive at a conclusion that there was overgrazing, overpopulation? It's based on the fact that all of the documents where they talk about whether standards are being met or not, all indicate that there's a thriving natural ecological balance on the range. At the present time, and therefore BLM can't stop the overpopulation until the effects which they predict occur? No. There is a circumstance wherein there is, the threat is so high, the problem is that the determination from the EA does not establish that it was wild horses and burros alone that were causing these effects, and it also doesn't establish that the effects take these allotments out of a thriving natural ecological balance. So to base a roundup that removes 80% of the horses, captures all of them, institutes immunocontraceptive use and unnatural sex skewing on the information in this record? Let's go back to your statement. The EA does not establish that wild horses and burros caused the effects which the BLM attributes to wild horses and burros. Is that correct? She said alone. Yeah. Horses and cattle were responsible, and you can look at the riparian functional assessments, because the riparian and wetland areas are the only areas that the EA even describes as having impacts currently. The upland health vegetation of the entire range, except for deep cut, is doing quite well. The biodiversity standard isn't being met by wild horses, so the only focus is on these few riparian areas. And in their EA, they say that they've been doing these riparian functional assessments since 1995, and it leads you to believe that they've actually done them every year and that they know what's going on. But in point of fact, the majority of them were done in 1995 and 1996, almost 146 of them, and for 2008 and 2009, they only did 47 in the entire 700,000 acre HMA. And the results of those indicate that wild horses are not solely responsible for any impacts. Counsel, if you had to hazard a percentage of the impact, that's a trick question. If you had to hazard a percentage of the impact attributable to the horses, what would it be? Well, in 2009, in the Twin Peaks allotment, they found that they surveyed 11 percent of all the riparian sites, and they found that 30 percent were functioning at risk due to wild horses, 10 percent were functioning at risk due to the allotment of impacts regarding riparian areas. And our claim is based on the fact, is this enough? Does this reach the benchmark test of TNEB for the scope and intensity of the roundup that they implemented? And you say no? I say no. And based on what case authority supports your argument that this would not be enough of an impact to justify the actions taken by the agency? Well, the thriving natural ecological balance is actually defined by the agency, and it's defined as assuring significant progress toward achieving the land health standards. And in this situation, Twin Peaks and Observation were both in that condition. They both met thriving natural ecological balance. If there is no bound, there has to be a rational connection between the facts, i.e., the amount of impacts and what's attributable to the horses and the decision made. Okay. Well, you said 30 percent. But that's 30 percent of 11 percent. We're talking about very minimal surveys that happened in 2009, and like I said, the vast majority of the surveys took place 15 years ago. So you're saying, okay, go ahead. Of the 11 percent of affected riparian areas, 30 percent of that 11 percent was caused by wild animals. Right. In the Observation allotment, they surveyed 8 percent of the sites in 2009, and that is a total of 7. Wasn't that supposed to be a sample? I mean, isn't that are you saying they have to survey all of them? Well, yeah. I mean, you can't go out and survey a riparian area on acre number two in 150,000 acre allotment and then say, well, that's representative of the entire allotment. Well, you can do it. The question is whether or not that... It's not reasonable. It's representative. And it's not representative, and they don't assert that it's representative. Could you answer Judge Rawlinson's question? Are there any cases which support you and set a minimum amount of area to be surveyed in order to have a reasonable basis upon which to make decisions? Considering that this is the first wild horse case that's made it to the Ninth Circuit, or any circuit for that matter, how about an analogous area which calls for a survey to be done by the BLM before measures are put in effect? I would be happy to do some research on that. We've had cases involving cattle grazing where there's been overgrazing by cattle. Do you have any ideas about percentages involved with that? I don't have any ideas of percentages involved in that. All I know is that the T&EB standard is being met, and if T&EB is the benchmark of the act, then it needs to mean something. And this is the BLM's own definition of T&EB that we're talking about. So it's not... The only question for the court to resolve is, has the standard been violated? Is there substantial evidence in the record to support the unprecedented intensive roundup that they prepared and implemented in 2009? I noticed that Judge England mentioned that there were nine gathers within the Twin Peaks HMA area that have taken place since 1998. Were those gathers fewer and lower in intensity? Yes, they were. They were much lower in intensity. The typical percentage of the herd that was removed was about 20 or 30 percent. They used to do gathers every one to two years and take a small percentage of the population. Were the sterilization procedures incorporated into those gathers? They have never done immunocontraceptive application. They've never done sex skewing, a natural sex skewing, and they've never done a roundup of this intensity before. This represents a complete shift in the roundup policies, and it's dictated by the Salazar plan that came out in 2010, which has yet to be approved by Congress, but is being implemented everywhere in the West. I'm trying to figure out your argument that there's no showing that this isn't thriving, so that they have to do any roundup at all, I guess. I'm just having trouble. I did not understand that as one of the arguments in your brief. No, I'm not saying that the evidence in the record didn't support some management activity. What I'm saying is that the evidence in the record does not support their assertion that 1,855 wild horses were excess, such that they must be removed from the range in order to restore or maintain a thriving natural ecological balance. That the intensity of this roundup and the scope with the additional manipulations far exceeded the evidence in the record regarding localized impacts that were attributable to both wild horses and cattle. So, counsel, if we agree with your argument and reverse the district court's entry of summary judgment, what would that accomplish for you? Well, I think the main accomplishment that plaintiffs are going for here is to give voice to the will of Congress and the protections that are in place for the wild horses through the act. And also to have them actually analyze the impacts of this roundup, which they did not do at all in their EIS, I mean EA. Okay, you've used your time. I know. We'll give you some time on rebuttal. Are there any questions? I have one question. You made a motion for summary judgment and that was denied. Yes. Have you appealed that denial? That's what we're here doing today, I believe. No, no, I think you've appealed the grant of the motion of summary judgment to the department, to the government. But your motion for summary judgment has been denied. I'm pretty sure that the order that came down for denying ours and supporting theirs was one in the same. My next question was this. If we were to reverse the judgment in favor of the government and to grant your motion for summary judgment, what would that do to the BLM's program of roundup of horses? Would it be able to do anything? Of course, they could do anything so long as it was in line with the act, meaning they need to euthanize. What remedy do you seek in your motion for summary judgment? The remedy that we sought was to, declaratory relief, obviously, to establish whether or not the BLM is properly interpreting and implementing the statute. What would be the order you'd submit to Judge England if we reverse him in his denial of your motion for summary judgment? What should he order the BLM to do? Okay, he should order the BLM to prepare an environmental impact statement. To? To prepare an environmental impact statement. Okay. He should vacate the finding of no syndicative impact. He should instruct the BLM to prepare, to return horses to the range so that the range is being managed principally for wild horses and burros. And would he order them not to do any rounding up of horses and eliminating of the infirm? And old and sick horses? Well, he would instruct them that the next round, if they do, they must euthanize the old, sick, and lame horses prior to implementing the gather. Right. And that horses which are not impacting the thriving natural ecological balance must be left alone. In this situation, even if you accept the BLM's arguments about AML being, you know, not a good thing, the benchmark, even they manipulated horses that hadn't done anything wrong. The non-offenders, as I like to call them, which is contrary to Section 1331 of the Act protecting wild horses against capture, harassment, branding, and death. And I guess the big question is the long-term holding. They would, the practice of shipping these animals to the Midwest to be stored in old cattle ranch pastures. Are they fenced in? Yes. They're fenced in and they get about 10 to 11 acres per horse, whereas out here on the 700,000 acre range, even if there's 2,000 horses, they have about 10 times that. They're also castrated, separated by sex. It's all in the briefs. Thank you so much. May it please the Court. I'm Mark Hay from the Department of Justice representing BLM. Also at Council table is Doug Burden, who represents the Intervenors Safari Club International. I'm going to take 16 minutes and try to leave four minutes for Mr. Burden. The Wild Horse Act gives the Secretary of the Interior the authority to protect and manage wild horses as part of a broad responsibility to manage the public lands for multiple use. The Council, the predicate to the Wild Horses Act is that wild horses, the free roaming of wild horses is part of the legacy of this country, and that these horses are to be protected from capture, branding, harassment or death to the maximum extent possible. That's the overriding theme of the Act, isn't it? Yes, Your Honor. That's the Congressional statement of purposes, but, well, not but. The operative terms of the statute that are relevant here, in particular, are Section 1333. A and B. But you're not arguing, are you, that the agency can apply the statute in a way that's inconsistent with the purpose, are you? No. And I think the record here shows that BLM takes the purpose of protecting and managing these animals in the most humane manner possible very seriously, and that this gather reflects an attempt to implement those, to realize those purposes. Mr. Burton, could I ask you a question that was raised by, an answer by Ms. Fazio? If nine previous gathers have affected 30 percent of the horses prior to, up to 1998, why have such a, why have such a large number of those conditions changed so as to justify gathering 80 percent of the horses now? Well, there are a couple of parts to the answer to that question. I'm not sure that Ms. Fazio said that the prior gathers have only affected 30 percent, but the Twin Peaks Herd Management Area is divided into five sub-areas. And the prior, they're called home ranges, and the prior gathers were all gathering the horses on a sub-range. And so while the total number of horses gathered was lower, those prior gathers were at, were gathering 75 or 85 percent of the horses on the, on the sub-area. So this time, the Twin Peaks gather is gathering from all five areas. And the agency went through the areas one at a time to gather about 80 percent of the horses. We were talking about the 2010? The 2010 gather was on all five sub-areas. Could we put that in numbers, then? Could you give us rough numbers in terms of the prior nine gatherings and the 2010 gatherings? That would translate a little easier for me. I believe those numbers are in the EA. I can't give them to you off the top of my head, Your Honor. I think that the highest prior, I think that the highest prior individual gather was about 800 horses. And this gather was about, the EA says up to 2,300 horses. And in the reality, what the agency was able to accomplish was just short of 1,600 horses. So the absolute number is bigger, but the absolute area, the area that the horses are being gathered from is also bigger. And in terms of looking at the intensity of the effects on the environment, what's relevant is not how many horses have been removed, but how many horses are left behind. And the gather here was designed to bring the number of horses on the whole herd management area within the appropriate management levels that have been established in prior decisions. What is your response to the argument that the appropriate management level is not the proper standard here and that you should be looking at a different standard? I think as a legal matter that's incorrect, but I don't, but the premise that appropriate management level is somehow in opposition to or inconsistent with thriving natural ecological balance is wrong. That's an incorrect premise. The agency set appropriate management levels based on what it believes is necessary to maintain the thriving natural ecological balance. Its authority to do that, to set the appropriate management level is what? Section 1333B1 and B2. The statute refers to both appropriate management level. 1333B1 says the secretary shall determine whether appropriate management levels should be achieved by the remainder of the year. The goal being to have a thriving balance. Right. And thriving natural ecological balance is a concept that embodies both a scientific judgment and a policy judgment of balancing multiple uses. But I was getting ready to say, you don't just look at the horses and burros to determine the thriving natural ecological balance. You look at the entire range of uses that are in the area. That's correct. And so did the environmental assessment do that? It did, Your Honor. The environmental assessment looks at the effect that the, it looks at the existing conditions and the effects that the proposed action would have on the horses, the upland vegetation, riparian areas. There's also a section discussing effects of cattle grazing, and there's an addendum to the EA, I think. Do you agree with opposing counsel's representation that the wild horses and burros were not the major infringers of the environment? No, Your Honor, I don't. I think that the EA explains where the impacts are happening. And I guess, but to take a step back, I don't think that the requirement is that the horses be a major cause of... Well, the difficulty I'm having is that there has to be some connection between the decision that's made by the agency and the environmental assessment. And the facts upon which that decision is based. And so if the goal is to maintain the thriving natural ecological balance, and the agency has determined that removing this number of horses and immunizing and relocating is necessary to sustain that balance, where is the linkage? I guess that's my concern. The fact that the horses were currently causing some damage to riparian areas in particular, and to cultural artifacts, and it also found that with the expected population growth, the populations double every four years, that that damage would increase. Was that enough to show under the statute that the thriving natural ecological balance was affected at the point that the decision was made? Yes, Your Honor, it is. The statute 1333B1 authorizes the secretary to determine whether appropriate management levels should be achieved by removal or destruction. And 1333B2 says that when the secretary determines based on any information available, essentially, that an overpopulation exists and that action is necessary to remove excess animals, she shall immediately take action to remove excess animals so as to achieve appropriate management levels. And so how is the determination of excess animals made? It's made based on population surveys and comparing the existing population to the appropriate management level that has been established by the agency. And I guess the... To me it's missing a step. Because to me, my problem here is that I thought the purpose was to achieve a thriving natural ecological balance. And that the appropriate management level determination was just a tool to get to that thriving natural ecological balance. But it seems to me that the agency disregarded the thriving natural ecological balance determination, just skipped right to the appropriate management level. Not as a tool, but as the end result. Why am I wrong in thinking that? Because that's not what the EA says. It's a discussion of what the appropriate management level is and how it's being exceeded. But it also discusses the actual environmental effects on the ground, the impacts to riparian areas, the impacts to cultural artifacts. Right. And what is your response to the argument that they didn't look at enough area to determine that there was a threat here? Well, I think that that's incorrect. I think the record shows an effort to look at riparian areas. The fact that only a certain percentage of riparian areas are surveyed every year doesn't mean that the conclusions are based on a 2008 survey or a 2007 survey are inaccurate. Do you think it's required to have a representative number of areas surveyed in order to rest the agency's determination on the results? I think there has to be a valid basis for the agency's determination. And I think there is that here. I have to say I'm a little bit at a loss in giving a more specific response to this, because this is not an issue that is addressed in the opening brief. It was a focus of the litigation in the district court, but it was not raised as a separate issue on appeal. And the district court's handling of this was what? The district court found that the record supported the agency's determination. And I think the key point here is that the agency looked at... I believe so, yes, Your Honor. But I think the key point here is that the agency didn't just say you're exceeding appropriate management levels, therefore we have to do a removal. It looked at the actual state of the environment, the impacts on the ground, and looked at what the future impacts were going to be. And there's certainly nothing in the statute that requires the agency to wait until there's substantial damage before it takes any action. But at what point does it become speculative? At what point does it, I mean, can the agency say 100 years from now we may have some problems so we can remove the horses? Now, there has to be some boundary set on the agency's discretion to project into the future and implement immediate action for some future harm. I agree with that, Your Honor, but I don't think that, I think that the agency found current harm here, that EA holds, finds that there is current harm here, and that it's going to get worse. What was the current harm that the agency found? The current harm is injury to riparian areas and to cultural artifacts. I thought the record was that the riparian areas were thriving at the particular time. At the time of the decision of the, at the time that the EA was done. The EA has holdings as to impacts on, let me get the record. I think it's, it talks about 50 individual riparian areas were affected by the EA. 50 areas where there's damage, and, or 50, 50 wetland areas and 53 Lentic sites, which are seeps and springs, this is at ER 360, and a lesser number of lotic sites, streams, creeks, and reservoirs, EA 361. But I thought we were talking about the, if you look at the areas as a whole, that there was not substantial damage to the riparian areas. I guess, you know, that's, that's opposing counsel's characterization of, you know, the overall, the conditions on the range are pretty good. But the fact that overall the conditions on the range are pretty good doesn't mean that there isn't actual damage happening to specific sites. And Judge Baird said, what was the nature of the damage? It's trampling, it's erosion, it's loss of vegetation. And the erosion in the cultural, in the sites where there are cultural artifacts leads to the loss of cultural artifacts. We're creeping into your co-counsel's time, but I just want to ask you, I find this whole case quite perplexing as to what practically is going to happen. The appropriations bill still have a bar to euthanasia of the horses, is that right? Yes, because I don't think we've had an appropriations bill in a while. Yeah. Just another problem, yeah. I just had one more question. Did the appropriate management level determination also justify the sterilization methods that were used? The population, there were no sterilizations. Well, wasn't there an implant? That's what I'm speaking to. Infertility implants. It's a contraceptive drug that works for a year or two. And the... I'm glad it's you and not me, Your Honor. Well, are you now, is the plan to keep these animals in large pens that are on private land, is that the plan? The animals that are not adopted, yes. Okay. I think we should hear from your co-counsel. May I just say one word about remedy, Your Honor, in terms of your question? I think the district court's decision here is correct and should be affirmed, but if this court thinks otherwise, the appropriate thing would be to remand to the district court. For it to make a determination in the first instance on remedy. Did the parties explore mediation of this case? Yes. Unsuccessfully, I presume. Unsuccessfully. Okay. Please support. I'm Doug Burden, Counsel for Defendant Intervenor, Appellees, Fire Club International. I'd like to focus on two of the legal points addressed in our briefs. The first is the old, sick and lame question. And the second is the ability, the authority to transfer to long-term facilities. The appellants call for a look at the plain language of the statute. And that plain language is that the, quote, the secretary shall order old, sick or lame animals to be destroyed in the most humane manner possible. So the operative verb is order. In this case, no one disputes that the decision documents ordered that old, sick and lame horses be destroyed as part of the gather. Whether that destruction occurs on the range or after the gather, therefore, is not relevant. Certainly BLM could have ordered destruction to occur on the range or on the range and after the gather. Counsel, what do you do with the language that precedes that that says such action shall be taken in the following order and priority? So it says that the old, sick or lame animals are to be destroyed. That's the first order before the removal. So do we disregard the fact that Congress said specifically that here is the priority that has to be followed in terms of removal? Well, the first priority is for the secretary to order the destruction of old, sick and lame animals. And it did that. She did that and BLM did that in these decision documents. So your argument is as long as the order is put into effect, they don't have to be destroyed before there is compliance with that particular section? So the order is complying with the requirement that they are to be destroyed? The order complies with the first priority, which is that the secretary shall order that old, sick and lame animals be destroyed. The other two sections say that the secretary shall cause excess horses to be adopted, and the third priority is that shall cause the destruction of, you know, whatever horses remain. I don't agree with that reading because it says additional excess animals. So the clear implication is that after the old, sick and lame horses are destroyed, they are to be removed. After the old, sick and lame horses are destroyed, the additional excess after that are to be dealt with. I think that language addresses the idea that they should gather for that second priority, the horses, where there's a demand for adoption. Now, what does additional excess animals refer to? Additional excess wild free-roaming horses and burros. What does that refer to if it doesn't mean the ones remaining after the first priority is implemented? Well, the first priority talks about old, sick and lame horses, and the bureau may be able to identify them on the range, and they may not. If they can only destroy those horses on the range before the gather, what happens if those horses, after the gather, they discover they missed something? They miss some on the range, and they have old, sick and lame horses that they now can't destroy. But does that mean they can totally disregard the priority that's set forth by Congress? Again, I think the priority, the first priority is to order the destruction of those old, sick and lame horses. And I think Congress did that because they weren't sure how this was going to go down, that this gives the BLM discretion to do it before, if possible, or do it after the gather when they have the experts that can actually look at the horses up close. Are you essentially saying what Judge Friedman said in the D.C. District Court case, that rejecting the plaintiff's reading that no healthy horse can be captured before all the older and firm horses are destroyed? I think that's not the sole basis of this argument. The sole basis is the plain language of the statute, which doesn't say destroy the horses first. It says order the destruction of those horses first. Did the secretary do that in this case? Yes. Where's the order in the record where the old, lame horses were order destroyed? Where is that in the record? In the excerpt of record 326, it's a description of the selected alternatives and the decision to humanely euthanize old, sick and lame horses. ER 391 and 2 talks about the post-gather examination of horses for healthy, for their health, whether there's injuries or other defects for purpose of euthanasia. ER 422 is the decision whether to destroy old, sick and lame horses. It is to be made by representatives of the contractors. Let me ask you this. How many horses were euthanized pursuant to the order of the secretary? I'm not sure. I understand it was a fairly low number. All right. And the last site from the record is ER 466, which is the field manager's decision adopting the EA, which the previous sites were from. So is it your position that it doesn't matter how many horses are actually euthanized so long as the secretary makes the order? I'm trying to make sure I understand your question correctly. I think the BLM has, based on their experience, has understanding of, based on the number they're trying to gather, how many of those are likely to be old, sick and lame. They take that into account when they make their decision. But it's, I don't think it's, the BLM anticipates that. I was just asking you what your position is. Is it your position that it does not matter how many animals are actually euthanized under this provision so long as the secretary enters the order? Complying with the statute, it doesn't matter. But, again, I think they would have, they would not expect that the destruction of old, sick and lame horses would eliminate the need for excess, for removing excess horses, especially in a gather of this size. I understand your answer. The last point I want to make about the transfer to long-term facilities is the definition of public lands, which the appellants rely on. It mentions the administered by language as a way to distinguish between lands, all of which are owned by the United States, but lands administered by the BLM Forest Service, to which the Wild Horses Act applies, and those lands owned by the U.S. that are administered by other federal agencies. Where are they going now? I'm sorry? Where are they going now, to government land that is not BLM public land? Right. They're going to private land. Or private land. Private lands. Right. And is the government paying for the upkeep of those horses on private land? Yes, they are. That's the, as I understand it, the majority of the BLM's budget goes to maintenance of these horses on private lands. May I ask the audience, please, to refrain from interruptive noise? Thank you. And the other point was, if I was interrupted? No, we understand your argument. I think we understand your position. Okay. And the last point is FLIPMA 1332B, which broadly authorizes BLM action to prevent degradation of public lands. The only point I want to make is that this could apply particularly because Congress, and this was a point I was going to make, Congress removes the term, removed the authority to euthanize healthy horses. So they had to go somewhere. FLIPMA steps in and provides additional authority for them to take that step. Okay. Thank you. I just have a couple points I want to try and hit. First, let's see, you asked about how many horses were euthanized with pre-existing conditions. There were four, including a foal, that were rounded up, chased by helicopters, and they all had broken legs or deformed feet. They can, in fact, and do, in fact, evaluate the condition of horses on the range on page ER420, appendix A. Standard operating procedures for wild horse or burro gathers. They talk about the pre-capture evaluation and note that the evaluation will include animal conditions. And if it is determined that a large number of animals may need to be euthanized, these services will be arranged before the capture would proceed. So they go out on the range, they review the condition of the horses, and they say, okay, it looks like we've got a good horse. We might have to euthanize six, and so they have a veterinarian on staff to do that after they've chased them down with helicopters and driven them to the trap sites. But do you agree... Helicopters are provided for specifically as a means in the statute, are they not? Yes, they are. So, I mean... But chasing down a horse with a broken leg with a helicopter is not provided in the statute, and that was the point I was trying to make. But it's all right to observe which animals are not moving well from a helicopter, right? You call it chasing down, some other people might call it observing. No, they don't go out in helicopters, I don't think they go out in helicopters to look at the horses before they round them up. They round up the horses with the helicopters, and before they do that, they send their people out onto the range, I'm assuming in trucks, to review the condition of the horses. Yeah, what's wrong with that? I'm not understanding it. What's wrong with that is that the Act specifically provides for minimizing the suffering of old, sick, and lame animals, and establishes an order and priority for which removal, euthanization is removal, of excess animals can occur. And it dictates that the first thing that the BLM is supposed to do, once they've determined that there is an excess of animals, overpopulation with regard to T and E, and that animals must be removed, i.e., are excess, is that they need to go out, figure out who's old, sick, and lame, and euthanize them before they initiate capturing additional excess horses. They're supposed to do that on the range? Yes, and they can do that. And the D.C. Circuit, the D.C. opinion, District Court opinion, does not agree with that? No, the judge said that you have to... Thought that it was impractical. Right. What's wrong with that? Why isn't it impractical to shoot all the lame ones first? I'm sorry, I got that backwards. That's not me. It seems very awkward to go out and shoot all the lame ones first, rather than having you gather to figure out which ones they are. Well, they can figure out which ones they are by going... This isn't about, you know, just taking out... When we talk about old, sick, and lame, we're talking about infirmities that are readily observable. You're not just going to kill a horse because it's 26 years old. You're going to kill a horse because it's 26 years old, it's lost all its teeth, it can't eat, and its body condition is going to represent that when you look at it on the range. But whether you or I or Safari Club thinks it's impractical, Congress mandated this is how it shall be done. And if there's an issue with it, then you need to go back to Congress to fix that. The agency doesn't have the discretion to simply reinterpret the statute. You think the statute mandates that? Yes, I think the plain language... I just wanted to ask you, do you... Do you agree with Defendant Intervenor's point that the statute is clear, that so long as the secretary orders euthanasia for the old, sick, and infirm, that that priority is satisfied? I completely disagree with that, and for the life of me, I cannot imagine the conferees sitting around in a room saying, as long as it is decreed that these old, sick, and lame horses be destroyed in the most humane manner possible, it doesn't matter that the end result of that decree is that they are treated inhumanely. The question seems to be whether or not they have to do it before there's a gathering. Yes, and I think that the plain language of the Act and the legislative history clearly indicate that they aren't. If you would permit, I just have two more brief things. Judge Rawlinson, I believe you asked about the gather history and how many horses they removed in previous years. That's located at ER 341, and Opposing Counsel was correct. The most they ever removed before was 868. And his point about it being a larger percentage back when there were five HMAs instead of one large one is somewhat misleading because the horses can actually interact with each other. So while there may have been a reduction, a substantial reduction in one of the HMAs, they can interact with the rest of the horses on the range and the overall number of horses would have been much larger left out there. And they were left out there unmanipulated by the BLM, actually wild, not rounded up and injected and sex-skewed. The only other point I wanted to make was about AML. And I believe the District Court actually said that because AML was set based on range conditions 15 years ago, that it actually is a proxy for a thriving natural ecological balance. And I believe that that is an incorrect interpretation. But that is what the District Court said. I think what the BLM did in this circumstance, interestingly enough, that excess animals, the exact number of excess animals was the exact number that exceeded the low AML. And they claimed, we are mandated by Congress, we must remove these animals. And then they didn't even reduce them to that number. So was it a mandate or not? All right. I think we've exhausted that point. Thank you. Are there any further questions of the Appellants' Council? All right. Thank you.
judges: Schroeder, Rawlinson, Bea